**SECOND DIVISION**
**MILLER, P. J.,**
**BROWN and GOSS, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**November 1, 2018**

# In the Court of Appeals of Georgia

A18A1249. THE MEDICAL CENTER, INC. v. BOWDEN.

MILLER, Presiding Judge.

In this case, we consider whether the trial court properly granted class certification to a group of uninsured patients who received medical care following an accident and who then had a hospital lien placed against any potential tort recovery to recoup the cost of their medical care. After a thorough review of the record, we conclude that the trial court properly granted class certification.

Danielle Bowden, Jacqueline Pearce, Karla Jasper, and Christian Sprouse were injured in separate, unrelated auto accidents and treated at The Medical Center, Inc. (TMC), a Columbus hospital. Due to their lack of insurance coverage, TMC placed a lien on any recovery they obtained as a result of their accidents to cover the bills for their medical services, as permitted under OCGA § 44-14-470. Bowden sued TMC,

alleging that the amount TMC charged for medical care was unreasonable and thus the lien the hospital placed on any financial recovery she received was excessive. Bowden later moved to add Pearce, Jasper, and Sprouse as plaintiffs and requested class certification under OCGA § 9-11-23.

TMC opposed class certification, moved to exclude the Plaintiffs' expert testimony that the amounts charged were unreasonable, and sought summary judgment on the substantive claims. The trial court granted the motions to add plaintiffs and for class certification, admitted the expert's testimony, and denied TMC's motion for summary judgment. TMC now appeals on all three grounds. We conclude that (1) the trial court properly admitted the testimony of the Plaintiffs' expert; (2) the Plaintiffs satisfied their burden to show class certification was proper; and (3) summary judgment was not warranted except as to the claims under the Uniform Deceptive Trade Practices Act ("UDTPA"), OCGA § 10-1-372, and the Georgia Racketeer Influenced and Corrupt Organizations Act ("RICO"), OCGA § 16-14-4. Accordingly, we affirm the trial court's orders admitting the expert's testimony and granting class certification, and we affirm the trial court's denial of TMC's motion for summary judgment on the claims of unjust enrichment, unconscionability, breach of contract, fraud, negligent misrepresentation, attorney fees, and punitive

damages. We reverse the trial court's order denying summary judgment with respect to Bowden's claims arising under the UDTPA and the RICO Act.

*A. Background*

In 2011, an Enterprise rental car in which Bowden was a passenger was involved in an accident. Bowden, who was 21 years old at the time and who did not have health insurance, was taken by ambulance to TMC in Columbus, Georgia. There, she received emergency medical treatment that included surgery for a broken leg. TMC billed Bowden a total of $21,409.59 for her medical care and filed a hospital lien for that amount under OCGA § 44-14-470 (b).[1] This lien attached to any recovery Bowden received from her accident.

In 2012, Enterprise filed a complaint in interpleader against Bowden and TMC and paid its liability policy maximum amount of $25,000 into the registry of the trial court. Bowden answered the complaint and filed a cross-claim against TMC, alleging that her bill of $21,409.59 was grossly excessive and did not reflect the reasonable value of her medical treatment.[2] Bowden asserted claims against TMC for unjust

---

[1] TMC outsources the lien process to a third party, Aspirion Health Resources. Once a lien is filed, there is no further attempt to collect the debt from the patient.

[2] TMC offered to settle the outstanding balance for $8,333, but Bowden rejected the offer.

enrichment (or alternatively, breach of contract), fraud, negligent misrepresentation, and violations of the Uniform Deceptive Trade Practices Act ("UDTPA"), OCGA § 10-1-372, and the RICO Act, OCGA § 16-14-4.[3] As relief, she sought compensatory damages, attorney fees, punitive damages, and dismissal of TMC's lien. See *Bowden v. The Medical Center*, 297 Ga. 285, 286-288 (1) (773 SE2d 692) (2015) ("*Bowden II*").

After Bowden filed her cross-claim, the parties engaged in a lengthy discovery dispute, and the trial court granted Bowden's motion to compel discovery of evidence regarding patient billing, liens, and the rates TMC charged for each service. *Bowden v. The Medical Center*, 327 Ga. App. 714 (761 SE2d 116) (2014) ("*Bowden I*"). TMC appealed, and this Court reversed, finding the discovery sought was not relevant. The Supreme Court of Georgia granted certiorari and ultimately concluded that such evidence was relevant to the reasonableness of the costs and liens. See *Bowden II*, supra, 297 Ga. 285.

On remand to the trial court, TMC provided the requested discovery. Thereafter, Bowden filed two amended complaints and petition for class action. In her

---

[3] Bowden also alleged that the emergency nature of her injuries and treatment prevented her from utilizing the provisions of OCGA § 31-7-11 to make pre-treatment cost comparisons. However, she has abandoned that claim.

4

amended complaint, Bowden restated her original claims and added a request for injunctive relief for the class. She later moved to add as plaintiffs Pearce, Jasper, and Sprouse. In support of her petition for class certification, Bowden submitted the deposition of an expert accountant, Lamar Blount. TMC opposed class certification and submitted the deposition of its own expert, William Cleverley.

The trial court conducted a hearing on the petition for class certification and heard testimony from both Bowden's expert and TMC's expert, each of whom opined about the reasonableness of TMC's charges and the feasibility of determining damages should the trial court certify the class. The trial court concluded that the testimony of Bowden's expert was admissible and that the named Plaintiffs satisfied the criteria for class certification. The trial court also denied TMC's motion for summary judgment. This appeal followed.

*B. TMC's payment structure*

Before we consider the issues on appeal, we first describe the billing process TMC employs.

Hospitals set their rates by calculating a "chargemaster rate," like the sticker price of a new car, for each service provided, and that rate applies to all patients receiving that particular service. The hospital determines its chargemaster rate by

factoring in the cost of the service along with the overall costs of operating the hospital. Every patient is charged the chargemaster rate, but very few patients actually pay that amount because insurance companies, including Medicare, Medicaid, and other third-party payers, negotiate a reduced reimbursement rate.[4] Thus, for patients with insurance, the insurance company will reimburse TMC pursuant to the negotiated rates. Additionally, Medicare and other government programs have a set methodology used to calculate their reimbursement amounts.

Patients without any insurance or third-party payment source are billed the full chargemaster rate. For the relevant years pre-dating this lawsuit, the percentage of TMC patients who paid less than the chargemaster rate was 98.84 percent, while only 1.16 percent paid the full rate. Regardless of the reimbursement scheme, and despite the chargemaster rates, TMC collects, on average, about 33 percent of the chargemaster rate.

To place this rate in context, the evidence shows that Bowden's bills totaled approximately $21,000. Because she lacked any insurance, she was billed that full amount. Had she been covered by Medicaid, the hospital would have received

---

[4] The Georgia Legislature encourages private insurers to negotiate with hospitals to charge lower rates for medical care provided to covered patients. See OCGA § 33-30-21.

$9,895.24 for reimbursement. Medicare would have reimbursed $11,238.11, and Blue Cross/Blue Shield PPO would have paid $10,644.

When an uninsured patient is unable to pay the full amount billed, the hospital may take out a lien under OCGA § 44-14-470 against any recovery that patient receives from a third-party tortfeasor. Virtually every state has a similar lien statute. See *Howard v. Willis-Knighton Medical Center*, 924 So2d 1245, 1253 (La. Ct. App. 2006).

OCGA § 44-14-470 (b) provides:

Any . . . hospital . . . in this state shall have a lien for the *reasonable* charges for . . . treatment of an injured person, which lien shall be upon any and all causes of action accruing to the person to whom the care was furnished . . . on account of injuries giving rise to the causes of action and which necessitated the hospital . . . care . . . . The lien provided for in this subsection is only a lien against such causes of action and shall not be a lien against such injured person, such legal representative, or any other property or assets of such persons . . . .

(emphasis added). Thus, the statute permits the hospital to place a lien on any recovery for only the *reasonable* amount of charges.

Finally, we note that since the inception of this lawsuit, TMC has voluntarily cancelled its lien against Bowden. Additionally, Plaintiffs Jasper and Sprouse have

paid their liens. Only Pearce's lien remains outstanding. We now turn to TMC's arguments on appeal.

*C. Discussion*

1. TMC argues that the trial court erred by admitting testimony from Plaintiffs' expert Lamar Blount because the expert's opinions lacked both reliability and relevance. We disagree.

OCGA § 24-7-702 governs the admissibility of expert testimony, and it requires that the trial court act as "gatekeeper to ensure the relevance and reliability of expert testimony." (Citation and punctuation omitted.) *Scapa Dryer Fabrics*, supra, 299 Ga. at 289. The statute specifically provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if: (1) The testimony is based upon sufficient facts or data; (2) The testimony is the product of reliable principles and methods; and (3) The witness has applied the principles and methods reliably to the facts of the case which have been or will be admitted into evidence before the trier of fact.

OCGA § 24-7-702 (b).

8

"[W]hether expert testimony ought to be admitted under [OCGA § 24-7-702] is a question committed to the sound discretion of the trial court." *Scapa Dryer Fabrics v. Knight*, 299 Ga. 286, 289 (788 SE2d 421) (2016). We will not disturb the trial court's determination "absent a manifest abuse of discretion." (Citation omitted.) *Mason v. Home Depot U.S.A.*, 283 Ga. 271, 279 (5) (658 SE2d 603) (2008). The trial court has "substantial discretion in deciding how to test an expert's reliability." (Citation and punctuation omitted.) *Butler v. Union Carbide Corp.*, 310 Ga. App. 21, 26 (1) (712 SE2d 537) (2011). The party seeking to rely on the expert bears the burden of proving the expert is sufficiently reliable. Id.

> [G]enerally, reliability is examined through consideration of many factors, including whether a theory or technique can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error for the theory or technique, the general degree of acceptance in the relevant scientific or professional community, and the expert's range of experience and training.

(Citations and punctuation omitted.) *Old Republic Nat. Title Ins. Co. v. RM Kids, LLC*, 337 Ga. App. 638, 647 (4) (788 SE2d 542) (2016). This is not an exhaustive list of factors, and courts may consider them in a "flexible" manner. *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F3d 1338, 1341 (II) (11th Cir. 2013). The trial court may

9

not exclude an otherwise sufficient expert opinion "simply because it believes that the opinion is not—in its view—particularly strong or persuasive. The weight to be given to admissible expert testimony is a matter for the jury." *Seamon v. Remington Arms Co., LLC*, 813 F3d 983, 990 (III) (A) (2) (11th Cir. 2016).

Here, Bowden submitted testimony from Blount, a certified public accountant. TMC challenges the relevance and reliability of Blount's expert testimony. In reviewing an expert's reliability,

> the trial court must consider whether the methodology by which the expert reaches his conclusions is sufficiently reliable. To this end, the trial court must ask whether the conclusions of the expert are based upon sufficient facts or data, whether the expert drew those conclusions by use of reliable principles and methods, and whether the expert applied those principles and methods reliably to the facts of the case.

(Citations and punctuation omitted.) *Scapa Dryer Fabrics*, supra, 299 Ga. at 289. In evaluating relevance,

> the trial court must consider the 'fit' between the expert testimony and the issues in dispute. To properly be admissible, expert testimony must assist the trier of fact to understand the evidence or to determine a fact in issue, and expert testimony is helpful to the trier of fact only to the extent that the testimony is relevant to the task at hand and logically advances a material aspect of the case.

10

(Citations and punctuation omitted.) Id. at 290.

In this case, Blount testified that there is a standard method among hospitals for calculating the reasonable amount of billed charges, and, according to his research, TMC charged rates that were higher than comparable hospitals. He noted that TMC collected only about one-third of the amount charged and yet remained a profitable hospital,[5] which supported his view that the chargemaster rates were unreasonable. He admitted that he had not seen the individual bills for any of the Plaintiffs and that he was not asked to evaluate their claims or lien amounts. He opined, however, that it would be easy to determine whether the amounts billed to each patient were unreasonable. He explained that he reached his opinion by viewing standardized types of services and comparing the average charges for hundreds of patients on a website called AHD.com.

As to class certification, Blount opined that calculating damages was not so individualized as to defeat class status, that there could be a class-wide determination of reasonable charges, and that the court could use the same methodology that hospitals use to determine who is eligible for financial assistance and the amount that could be collected from patients. Blount further explained that the use of computer

---

[5] TMC disputed that it consistently turned a profit.

11

software would enable the Plaintiffs to calculate damages – that is, the software could determine the rates patients should have been charged in comparison to the chargemaster rates for which they were actually billed.

TMC submitted testimony from its expert, William Cleverley, that its chargemaster rates, and therefore the amounts of its liens in this case, were reasonable. Cleverley stated that it was very common for a hospital to collect only a third of the billed charges. He also stated that the rates of the other hospitals Blount had reviewed were not comparable because those hospitals were not trauma centers like TMC. Cleverley further opined that any challenge to the reasonableness of a particular charge would need to be done on a case-by-case, individualized basis. Cleverley admitted, however, that computer software could review a submitted claim and determine proper reimbursement amounts once a baseline of reasonable charges was established.

Considering the testimony presented, we conclude that Blount's opinion was both reliable and relevant. See *Scapa Dryer Fabrics*, supra, 299 Ga. at 289. Blount explained the manner in which he reached his opinion and the facts on which he relied. TMC does not argue that Blount's methodology was improper or that his facts were inaccurate; rather, TMC's expert disagreed with Blount's interpretation of those

12

facts. Thus, much of TMC's criticism of Blount's testimony goes to its weight and not its admissibility. See *Seamon*, supra, 813 F3d at 990 (III) (A) (2). Indeed, TMC's expert agreed that there was a basis for determining whether an amount charged was reasonable. Where the experts differ is in their opinion regarding how to calculate reasonable charges for a class of patients.

Moreover, the trial court properly concluded that Blount's testimony was relevant. Our Supreme Court has already held that a comparison of charges is relevant to the issue of reasonableness. See *Bowden II*, supra, 297 Ga. at 296. Thus, Blount's opinions as to the reasonableness of the chargemaster rates are helpful to the trier of fact. See *Scapa Dryer Fabrics*, supra, 299 Ga. at 290. Given the conflicting expert testimony as to what charge rates would be reasonable and how to calculate those rates, the trial court did not abuse its discretion in admitting Blount's testimony as to the issue of class certification.

2. We now turn to TMC's argument that the trial court erred in granting class certification under OCGA § 9-11-23 (b) (2) and (3). TMC contends that class certification is not warranted because the Plaintiffs failed to satisfy the numerosity, typicality, and predominance requirements; money damages do not justify class certification under § 9-11-23 (b) (3); and the Plaintiffs' request for injunctive relief

13

was merely incidental to their claims for damages, making certification under (b) (2) improper. We conclude that the trial court did not abuse its discretion in certifying the class.

> The trial court is vested with *broad* discretion to decide whether to certify a class, and absent an abuse of that discretion, we will not disturb the trial court's decision. Implicit in this deferential standard of review is a recognition of the fact-intensive basis of the certification inquiry and of the trial court's inherent power to manage and control pending litigation. Thus, we will affirm the trial court's factual findings unless they are clearly erroneous. Under the clearly erroneous test, factual findings must be affirmed if supported by any evidence.

(Citations and punctuation omitted; emphasis supplied.) *Lewis v. Knology, Inc.*, 341 Ga. App. 86, 87 (799 SE2d 247) (2017).

Class certification involves a two-pronged analysis. First, the plaintiff must show that

> (1) The class is so numerous that joinder of all members is impracticable; (2) There are questions of law or fact common to the class; (3) The claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) The representative parties will fairly and adequately protect the interests of the class.

OCGA § 9-11-23 (a).[6] If the plaintiff meets the burden of satisfying these four

requirements, she must then show, relevant to this appeal, that either:

. . .

(2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) [t]he questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

(A) The interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) The difficulties likely to be encountered in the management of a class action.

---

[6] Although TMC does not raise this issue, we question whether Bowden remains a proper representative of the class given that her lien was dismissed. Although Bowden may have damages arising from this litigation, it is not clear that her claims and damages continue to be adequately representative of the class. See *Brenntag Mid South v. Smart*, 308 Ga. App. 899, 905 (2) (a) (iii) (710 SE2d 569) (2011) (plaintiff who had settled her claims was not a proper class representative). Cf. *Chambers v. Moses H. Cone Memorial Hospital*, 2018 WL 1801629 (N. C. Ct. App. 2018) (class action becomes moot when counterclaim for unpaid treatment costs is dismissed). We leave this question for the trial court.

15

OCGA § 9-11-23 (b) (2), (3). We consider each of these steps in turn, and we look to decisions of the federal courts in interpreting OCGA § 9-11-23. *Georgia–Pacific Consumer Products v. Ratner*, 295 Ga. 524, 525 (1) n. 3 (762 SE2d 419) (2014).

(a) Numerosity

TMC argues that the Plaintiffs cannot meet the numerosity requirement because the number of class members is speculative and not all members can show actual damages, given that they did not all pay for medical services. TMC further argues that the trial court improperly identified the class to include every person against whom TMC filed a hospital lien regardless of whether that person made payments on the lien or suffered injury due to the lien.

There is no minimum number of class members required for class certification, but the Plaintiffs estimate that as many as 10,000 people may have been affected by TMC's liens, and as part of their motion for class certification they submitted evidence of 267 liens. There is a general presumption that more than 40 class members would establish the impracticability of handling cases individually. See *American Debt Foundation v. Hodzic*, 312 Ga. App. 806, 809 (1) (720 SE2d 283) (2011).

Even if fewer than the 10,000 potential class members will actually be part of the class, the discovery submitted shows that the named Plaintiffs will be able to identify enough patients to satisfy the numerosity requirement. The fact that some of these class members might be entitled to fewer damages than others does not defeat class certification. *Fortis Ins. Co. v. Kahn*, 299 Ga. App. 319, 325 (3) (683 SE2d 4) (2009) ("Georgia law provides that minor variations in amount of damages do not destroy the class when the legal issues are common.") (citation, punctuation, and footnote omitted). Moreover, if, after further discovery, it becomes clear that class status is unmanageable, or that fewer persons than initially anticipated constitute the class, the trial court can modify the class or de-certify it as necessary. See *J. M. I. C. Life Ins. Co. v. Toole*, 280 Ga. App. 372, 378 (2) (c) (634 SE2d 123) (2006) ("It bears emphasis that certification orders are 'inherently tentative,' and the trial court retains jurisdiction to modify or even vacate them as may be warranted by subsequent events in the litigation."). We therefore conclude that the trial court properly determined that Bowden satisfied the numerosity requirement at this juncture.

(b) Commonality

To satisfy the commonality requirement, there must be "questions of law or fact common to the class[.]" OCGA § 9-11-23 (a) (2). See also *Brenntag Mid South v.*

17

*Smart*, 308 Ga. App. 899, 906 (2) (b) (i) (710 SE2d 569) (2011) ("the rule requires only that resolution of the common questions affect all or a substantial number of the class members.") (citation omitted). The commonality requirement is satisfied where "[t]he character of the right sought to be enforced may be common although the facts may be different as to each member of the alleged class." (Citation omitted.) *UNUM Life Ins. Co. of America v. Crutchfield*, 256 Ga. App. 582 (568 SE2d 767) (2002). This requires there be common questions for a determination of liability. *Village Auto Ins. Co. v. Rush*, 286 Ga. App. 688, 691 (1) (649 SE2d 862) (2007). In other words, "as long as the common questions predominate, a class may be certified even if some individual questions of law or fact exist." (Citation and punctuation omitted.) Id.

Here, the trial court found the commonality requirement satisfied because there are common questions of liability arising from common claims, as identified by the trial court:

> [w]hether [TMC] files liens for medical charges in excess of what is a reasonable charge . . . when the Plaintiff and/or Class member possesses a cause of action against a third-party.

> [w]hether [TMC] has fraudulently filed liens for medical charges in excess of what is a reasonable charge for the care and treatment rendered

18

when the Plaintiff and/or Class member possesses a cause of action against a third-party.

[w]hether [TMC] has misrepresented the amount that constitutes a reasonable charge for medical service when the Plaintiff and/or Class member possesses a cause of action against a third-party.

[w]hether [TMC] has violated Georgia law by filing liens for medical charges in excess of what is a reasonable charge for the care and treatment rendered when the Plaintiff and/or Class member possesses a cause of action against a third-party.

[w]hether [TMC]'s conduct caused damages to the Named Plaintiffs and the Class Members and, if so, the appropriate amount of damages, both compensatory and punitive.

After identifying these common questions, the trial court noted that the Supreme Court in *Bowden II* instructed that the amounts other patients were charged were relevant to the issue of reasonableness, and that the record contained evidence regarding how many patients actually paid the full chargemaster rate and the average amount TMC collected from bills submitted. We further note that there was testimony from Bowden's expert suggesting that TMC's charges were higher than those of other hospitals and that charging uninsured patients the full chargemaster rates was

19

unreasonable. Although TMC's expert opined that TMC's rates were reasonable and that addressing the reasonableness of every patient's charges would be a highly individualized task, Blount's testimony places at least some evidence in the record to support the trial court's conclusion at this stage of the litigation. See *Baptist Health v. Hutson*, 382 SW3d 662 (Ark. 2011) (certifying class in case involving reasonableness of chargemaster rates, finding that there were "common issues of liability and wrongdoing that affect all class members."). The trial court has broad discretion, and that broad discretion is to be respected unless abused. *Earthlink v. Eaves*, 293 Ga. App. 75, 76 (1) (666 SE2d 420) (2008).

Although courts in other jurisdictions have reached conflicting conclusions regarding whether to subject similar claims to class certification, "[t]he decision whether to certify a class depends in large part upon the description of the class, the claims raised and the evidence and arguments presented in support of class certification. Accordingly, we consider this case based upon the record before us[.]" See *Roland v. Ford Motor Co.*, 288 Ga. App. 625, 632 (2) n. 7 (655 SE2d 259) (2007).

TMC points to the cases of *Maldonado v. Ochsner Clinic Foundation*, 493 F3d 521 (5th Cir. 2007), *Howard v. Willis-Knighton Medical Center*, 924 So2d 1245 (La.

Ct. App. 2006), and *Eufaula Hospital Corp. v. Lawrence*, 32 So3d 30 (Ala. 2009), to support its contention that class certification is inappropriate.

In *Maldonado*, the Fifth Circuit Court of Appeals concluded that uninsured patients who were charged the chargemaster rates could not qualify for class certification because individualized issues predominated. 493 F3d at 524-525 (II) (B) & (C). The court noted that an injunction would not bring relief because many of the proposed class members paid nothing, and that calculating damages would be overwhelming because the reasonableness inquiry depended on multiple factors, including the patient's financial status. Id.

In *Howard*, the Louisiana Court of Appeals affirmed the denial of class certification in a case involving uninsured patients challenging the reasonableness of liens placed on bills generated using the chargemaster rates.[7] 924 So2d at 1260. Specifically, the court concluded that the class failed to satisfy the commonality requirement because the amount the hospital would collect on each bill was subject to numerous individual factors. Id. at 1262. As such, the Louisiana court found that individual issues predominated over issues relevant to the entire class. Id. Likewise,

---

[7] The Louisiana Court of Appeals concluded, however, that two sub-classes of insured patients satisfied the requirements for class certification. *Howard*, supra, 924 So2d at 1264.

21

in *Eufaula*, the Alabama Supreme Court vacated an order granting class certification on the ground that a computation of damages would be fact-intensive and too individualized to meet the predominance requirement under Rule 23 (b). *Eufaula*, supra, 32 So3d at 46.

We do not find these cases persuasive. First, in *Maldonado*, the court of appeals focused on the difficulty in calculating damages as a basis to deny class certification, but the court ignored the fact that there was a common question of *liability*. See *Brenntag Mid South*, supra, 308 Ga. App. at 906 (2) (b) (i) ("[A]s long as the common questions predominate, a class may be certified even if some individual questions of law or fact exist. Thus, common issues may predominate when liability can be determined on a class-wide basis . . . .") (citations and punctuation omitted). Moreover, the court's opinion considered the likely ability to "ever demonstrate that the chargemaster rates are unreasonable." *Maldonado*, supra, 493 F3d at 525 (II) (C). However, at the class certification stage, we do not consider the merits of the claims and are tasked solely with reviewing the factors under OCGA § 9-11-23. *Fortis Ins. Co.*, supra, 299 Ga. App. at 326 (4) (at the class certification stage, it is sufficient if the plaintiffs have credibly pleaded their claims).

22

In *Howard*, the Louisiana court based its decision on its finding that the lien statute provided only a "means to collect, not a basis to charge." *Howard*, supra, 924 So2d at 1262. Thus, the court determined that the reasonableness of the charges themselves was not a question that was common to the class. But that rationale simply begs the question: the lien statute authorizes the collection of only *reasonable* charges. In other words, deciding whether there has been a violation of the lien statute inevitably requires the courts to determine the reasonableness of the chargemaster rates that are used as the basis for the lien amount in the first place.

Moreover, we are not convinced that the Louisiana court utilized the correct inquiry. The common question – and answer – involve whether the hospital's action of seeking reimbursement of the full chargemaster rate from uninsured patients is unreasonable. This analysis does not depend on individual factors in a way that would defeat class certification, especially given the testimony here that a computer program could recalculate each individual bill once the jury determined a formula for arriving at a reasonable charge. Additionally, in this case, we have evidence of other rates in the community to assist in determining whether TMC's chargemaster rates were reasonable. The Louisiana court did not consider such comparable rates and instead focused on individual factors such as the patient's ability to pay and the amounts that

23

the hospital actually collects. Finally, the Louisiana court rejected the reasonableness claim for lack of evidence, but , again, we are not to judge the merits of the Plaintiffs' claims at this juncture. *Fortis Ins. Co.*, supra, 299 Ga. App. at 326 (4).

We are also unpersuaded by the Alabama Supreme Court's reasoning in *Eufaula*. The Alabama court rejected any consideration of comparable rates in the community to assist in determining reasonableness. *Eufaula*, supra, 32 So3d at 46. Here, our Supreme Court has already instructed that the rates charged by other entities is a consideration in determining reasonableness. *Bowden II*, supra, 297 Ga. at 292 (2). Thus, *Eufaula* does not dictate a conclusion that class certification was improper.

We conclude that the trial court properly found that the Plaintiffs satisfied the commonality requirement. The common question applicable to all class members is whether the chargemaster rate, which universally served as the basis for the lien amount, was reasonable. There is evidence that it would be possible to determine a common answer that does not require individualized analysis. There was conflicting expert testimony on the reasonableness of the chargemaster rates, and there was also evidence that TMC bills everyone the chargemaster rate but collects only about a third of the billed amount. Based on this evidence, a jury can make a decision on

24

reasonableness of the chargemaster rates that will apply commonly across the entire class.[8] See *Baptist Health*, supra, 382 SW3d at 668 (III). Thus, the Plaintiffs have satisfied this requirement.

(c) Typicality[9]

Although commonality focuses on "the group characteristics of the class as a whole, . . . typicality refers to the individual characteristics of the named plaintiff[s] in relation to the class." *Brenntag Mid South*, supra, 308 Ga. App. at 904 (2) (a) (iii); see also *Piazza v. Ebsco Indus.*, 273 F3d 1341, 1346 (II) (11th Cir. 2001). "The typicality requirement under OCGA § 9-11-23 (a) is satisfied upon a showing that the defendant committed the same unlawful acts in the same method against an entire

---

[8] That is not to say that, if the jury determines reasonableness using another payer source as a benchmark – Medicare or other third-party payer – that other methods of reimbursement are *unreasonable*. Our legislature has determined that allowing hospitals to contract with various payers is desirable, and those contracted rates include economic variables that may result in reasonable reimbursement rates. See *Bowden II*, supra, 297 Ga. at 293 (2); *Huntington Hosp. v. Abrandt*, 4 Misc.3d 1, 779 N.Y.S.2d 891, 892 (N. Y. App. Term 2004) ("The fact that lesser amounts for the same services may be accepted from commercial insurers or government programs as payment in full does not indicate that the amounts charged to defendant were not reasonable.") (cited in *Bowden II*).

[9] TMC raised the defense that some of the named plaintiffs are not typical of the class because they voluntarily satisfied their hospital liens. The trial court rejected that defense, and TMC does not challenge that ruling on appeal.

class." (Citation and punctuation omitted.) *Liberty Lending Svcs. v. Canada*, 293 Ga. App. 731, 738 (1) (b) (668 SE2d 3) (2008); see also *Kornberg v. Carnival Cruise Lines*, 741 F2d 1332, 1337 (11th Cir. 1984) ("A sufficient nexus is established if the claims or defenses of the class and the class representatives arise from the same event or pattern or practice and are based on the same legal theory.")

TMC contends that the potential class members are "so differently positioned from each other" but fails to elaborate on this assertion. Our review of the record shows that the Plaintiffs satisfied the typicality requirement in that all were uninsured, all were injured due to a third-party tortfeasor, and the hospital filed a lien against all for non-payment of bills at the full chargemaster rate. We thus conclude that the trial court did not abuse its discretion in finding that the Plaintiffs have satisfied the typicality requirement.

(d) Rule 23 (b) (2) certification based on injunctive relief

Having determined that the Plaintiffs met the threshold requirements, we turn to the second step in the certification analysis. Here, TMC argues that certification is inappropriate under OCGA § 9-11-23 (b) (2) because the Plaintiffs seek monetary damages that are not merely incidental to injunctive relief.

As to the request for injunctive relief, the trial court found that there were common issues that predominated over individual issues because the Plaintiffs' theory of liability was that TMC charged unreasonable rates to patients whose bills could result in a lien. Additionally, the trial court found that the putative class representative sought injunctive relief – i.e., to prohibit TMC from filing liens in excess of reasonable charges in the future. The trial court explained that the issue of injunctive relief would be bifurcated from the damages trial.

"Certification under OCGA § 9-11-23 (b) (2) is inappropriate if the predomina[nt] relief sought in the action is monetary damages. Monetary relief predominates in the action unless it is incidental to requested injunctive or declaratory relief." (Citation, punctuation, and footnote omitted.) *Doctor's Hospital Surgery Center v. Webb*, 307 Ga. App. 44, 47 (1) (704 SE2d 185) (2010). In this case, the Plaintiffs sought both monetary damages and injunctive relief to prevent TMC's use of the chargemaster rates to set the lien amounts. For many class members, the amount of the lien could be a few hundred dollars, and thus it is preferable to enjoin collection rather than obtain damages. We thus cannot conclude at this stage that the monetary relief sought overshadows the claim for injunctive relief.

(e) Rule 23 (b) (3) certification based on monetary relief.

27

TMC asserts that class certification under this subsection is inappropriate because the issue of damages is too individualized, especially when the trial court must also consider individual plaintiffs' state law claims, making it impossible to determine damages on a class-wide basis. They further argue that the Plaintiffs' expert did not offer any opinion about the proper method for determining damages and the trial court erred by selecting its own, flawed damages model that would award damages to class members who paid nothing.

Class certification is proper under OCGA § 9-11-23 (b) (3) when "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and [] a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Resource Life Ins. Co. v. Buckner*, 304 Ga. App. 719, 729 (3) (a) (698 SE2d 19) (2010). As we have explained,

> [t]he Rule 23 (b) (3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. A plaintiff may satisfy this requirement by showing that issues subject to class-wide proof predominate over issues requiring proof that is unique to the individual class members. Therefore, class certification is not appropriate if resolution of individual questions plays a significant, integral part of the determination of liability. But as long

28

as the common questions predominate, a class may be certified even if some individual questions of law or fact exist. Thus, common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues.

(Citations and punctuation omitted.) *Brenntag Mid South*, supra, 308 Ga. App. at 906 (2) (b). Moreover,

Plaintiffs need only come forward with plausible statistical or economic methodologies to demonstrate impact on a class-wide basis. Particularly where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification.

(Citation and footnote omitted.) *Fortis Ins. Co.*, supra, 299 Ga. App. at 325 (3); see also *J. M. I. C. Life Ins. Co.*, supra, 280 Ga. App. at 376-377 (2) (c) (plaintiff proffered method to prove overpayments through electronic records for purposes of class certification). In contrast, "[w]here the resolution of individual questions plays such an integral part in the determination of *liability*, a class action suit is inappropriate." (Emphasis supplied.) *Tanner v. Brasher*, 254 Ga. 41, 44 (2) (326 SE2d 218) (1985).

In reviewing the trial court's analysis, we consider factors such as:

29

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

(Citation and punctuation omitted.) *Brenntag Mid South*, supra, 308 Ga. App. at 905-906 (2) (b).

Here, the trial court found, and we agree, that common issues predominated because TMC's conduct was a repeated demonstration of allegedly unfair conduct in the same manner against every member of the class. The fact that there will be some individual considerations in calculating damages does not eliminate predominance because the question of *liability* is the same across the class. Because the question raised by the class certification is whether TMC sought liens in an unreasonable amount as established by the chargemaster rates and in contravention of the lien statute, and the determination of what is a reasonable charge may apply to each member of the class in the same manner, the Plaintiffs have shown that the class issues predominate. See *Resource Life Ins. Co*, supra, 304 Ga. App. at 729 (3) (a) ("[c]ommon questions of law and fact predominate when an action is brought on

30

behalf of purchasers of agreements from a common source, the character of the right sought to be enforced is common, and common relief is sought."); see also *Baptist Health*, supra, 382 SW3d at 667-668 (III) (common question predominates because the focal point was the reasonableness of the chargemaster rate, and thus was the "threshhold" issue).

As to damages, we note that, at the class certification stage, the Plaintiffs need only put forth a reasonable methodology for determining damages. *Klay*, supra, 382 F3d at 1259. The record here shows that there was expert testimony that computer programs are available to ascertain damages for the potential individual Plaintiffs. *In re Monumental Life Ins. Co.*, 365 F3d 408, 419-420 (IV) (B) (5th Cir. 2004) (use of standardized formulas to determine damages supporting class certification because this damages calculation "neither introduce[d] new and substantial legal or factual issues, nor entail[ed] complex individualized determinations.") (citation omitted). That it might be tedious or time consuming to calculate damages does not defeat class certification; "the monetary predominance test does not contain a sweat-of-the-brow exception." Id. at 419 (IV) (B).

> In assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods for computing damages are so

insubstantial as to amount to no method at all. [] Plaintiffs need only come forward with plausible statistical or economic methodologies to demonstrate impact on a class-wide basis. Particularly where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification.

(Footnotes omitted.) *Klay v. Humana, Inc.*, 382 F3d 1241, 1259-1260 (II) (C) (3) (11th Cir. 2004), abrogated on other grounds as recognized by *Dickens v. GC Svcs. Ltd. P'ship*, 706 Fed. Appx. 529 (11th Cir. 2017).

At the hearing on class certification, the Plaintiffs stated that they were not proposing a methodology for setting a reasonable rate. Nevertheless, Plaintiffs' expert opined that it would be quick and easy to calculate what the bill should have been for each patient in the class once the jury determined the appropriate benchmark for reasonable rates. He contended that the rates TMC charged were unreasonable compared to other hospital's charges and the rates collected by insurance and government coverage. In contrast, TMC's expert testified that the chargemaster rates were reasonable and that a jury's evaluation of the various charges would require consideration of numerous individualized factors.

Even considering the nature of the fraud and misrepresentation claims raised in the complaint, individualized questions would not defeat class certification. Although the issue of reliance might generally present a more individualized inquiry, in this case the misrepresentation and reliance are essentially the same for each member of the class: by filing hospital liens, TMC impliedly expressed that its charges were "reasonable," and the class members relied on that representation when they settled their claims or paid the liens.

Moreover, allowing this case to proceed as a class action is superior to forcing potential class members to bring individual suits. Many potential Plaintiffs face relatively small liens – and likely small amounts of damages – making it unlikely that they would pursue a minor claim in an individual suit. See *Brenntag Mid South*, supra, 308 Ga. App. at 907 (2) (b) (ii). And with a potential class size of several thousand patients, requiring each to bring an individual suit would clog our courts and potentially produce inconsistent outcomes. Id. ("There is simply no need to burden either the court system or the individual class members by requiring each member of the class to pursue his or her own action to recover a relatively small amount of damages.") (citation and punctuation omitted). We therefore conclude that individual considerations do not predominate over those relevant to the entire class.

(f) Lastly, we consider whether the trial court properly identified the class.

The trial court identified the class as: "All persons who have had a hospital lien filed pursuant to O.C.G.A. § 44-14-470 *et. seq.*, by TMC for the years 2007 to present against a cause of action they possessed and which lien was filed in an amount in excess of what is a reasonable charge for the care and treatment rendered." This would include in the class both insured and uninsured people, those whose liens were removed, and those who never settled their lawsuits and thus paid nothing. In this respect, the class as identified is overbroad. See *MCG Health v. Perry*, 326 Ga. App. 833, 835-839 (1) (755 SE2d 341) (2014) (insured patients challenging hospital liens for recovery monies that exceeded the insured reimbursement rate were not entitled to class certification because they could not establish the commonality requirement).

We do not find the overbroad definition of the class fatal in this case. As noted above, the trial court retains the authority to limit or adjust the class as the evidence develops. *J. M. I. C. Life Ins. Co.*, supra, 280 Ga. App. at 378 (2) (c). Based on our review in this case, we conclude that some number of uninsured patients who had liens filed would be entitled to class certification. Thus, on remand, the trial court should consider the above concerns in modifying the class as the litigation proceeds.

34

TMC also contends that the class is overbroad because it dates back to 2007, and thus some individuals' state law claims would be barred. There is no question that any class would exclude members whose claims are barred by the applicable statutes of limitation. See *Resource Life Ins. Co.*, supra, 304 Ga. App. at 719 n. 2 (class excluded those whose claims were barred by statute of limitation). Here, however, the trial court concluded that the class action complaint would relate back to the original complaint, thus making the claims timely. We see no error at this juncture.

As the record shows, TMC knew in 2015 that the allegations involved numerous potential Plaintiffs. The amended complaint and second amended complaint, as well as the motion for class certification, all raise claims stemming from the same conduct. Thus, the trial court properly found that the complaints related back. See *Morris v. Chewning*, 201 Ga. App. 658, 659 (411 SE2d 891) (1991); see also OCGA § 9-11-15 (c).

3. Finally, TMC challenges the denial of its motion for summary judgment on the ground that Bowden failed to establish any damages and the law allows liens filed

in the full amount of the charges.[10] TMC further contends that Bowden's claim for unjust enrichment fails on the merits, her claims are barred by equitable estoppel, and her claims for attorney fees and punitive damages fail as a matter of law. We agree in part and conclude that TMC was entitled to summary judgment on the Plaintiffs' claims under the UDTPA and RICO.

a. UDTPA and RICO

With regard to the UDTPA claim, Bowden argues that the different rates TMC charged led to confusion and misunderstanding under OCGA § 10-1-372 (a) (12), and that this practice constitutes a deceptive trade practice. Notably, the only remedy available for such a violation is injunctive relief. OCGA § 10-1-373 (a); *Lauria v. Ford Motor Co.*, 169 Ga. App. 203, 206 (3) (312 SE2d 190) (1983).

This Court has rejected a UDTPA claim against a hospital based on its chargemaster rates, deciding that it was not deceptive to charge the plaintiffs more than insured patients. *Morrell v. Wellstar Health System*, 280 Ga. App. 1, 6 (3) (633 SE2d 68) (2006). The existence of a lien does not alter the conclusion that there is no

---

[10] Bowden contends that her claims remain viable despite the removal of the lien because she should be compensated for the lost time value of her money during the period of the lien and she can recover for attorney fees and expenses. We express no opinion on whether those asserted losses are sufficient to establish damages.

basis for a UDTPA claim. Id. (hospital did not make false or misleading statements about the amounts billed simply because chargemaster rates exceeded the reimbursement amounts paid by Medicare beneficiaries); see also *Cox v. Athens Regional Medical Center*, 279 Ga. App. 586, 592 (2) (631 SE2d 792) (2006) (separate pricing scheme for uninsured patients results from the statutorily authorized agreements with third-party payers and does not violate UDTPA). The fact that the lien statute requires the amount to be reasonable does not mean that TMC has engaged in deceptive practices. Nor does the use of the chargemaster rate as the lien amount constitute any misleading statement or create confusion. Thus, the existence of the lien does not place this case outside the *Morrell* and *Cox* rationales.

As to the RICO claim, the Georgia RICO Act provides:

(a) It shall be unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money.

(b) It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

37

(c) It shall be unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (a) or (b) of this Code section.

OCGA § 16-14-4. The Act defines a "pattern of racketeering activity" as "[e]ngaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics . . . ." OCGA § 16-14-3 (4) (A). The Act defines "racketeering activity" itself as the perpetration of one or more of the crimes set forth in OCGA § 16-14-3 (4) (C), including theft by deception, false statements, perjury, extortion, mail fraud, and wire fraud.

Assuming TMC's lien amounts were unreasonable, such does not render the practice of filing liens, as permitted by statute, one of the RICO predicate offenses. See *Grauberger v. St. Francis Hospital*, 169 F Supp 2d 1172, 1175-1179 (A) (1) (N. D. Cal. 2001) (Plaintiffs do not state RICO claim based on allegations of filing fraudulent hospital lien). Accordingly, TMC was entitled to summary judgment on this claim as well.

b. Breach of contract, unjust enrichment, fraud, and negligent misrepresentation

Turning to Bowden's claims for unjust enrichment or breach of contract, fraud, negligent misrepresentation, attorney fees, and punitive damages, we cannot conclude that TMC was entitled to summary judgment. First, there continues to be a dispute over whether there was a contract for services between Bowden and TMC. Bowden's mother allegedly signed an admission form in which the signatory agreed to be responsible for payment. Then, after Bowden was discharged from the hospital, she returned for physical therapy and signed the same admission form. See *Bowden II*, supra, 297 Ga. at 295-296 (2) (b) (noting that there was a question of fact regarding whether Bowden had a contract with TMC because Bowden's mother signed the consent form, thereby arguably only obligating the mother to pay). The Supreme Court's decision in *Bowden II* implies that the Plaintiffs' claims, particularly her contract claim, remain viable causes of action.[11]

---

[11] TMC contends that Bowden's claims are barred by the equitable estoppel defense, and that she cannot rely on the chargemaster rates in claiming damages against Enterprise but then reject that basis for damages in her challenge to the lien. "In order for an equitable estoppel to arise, there shall generally be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence as to amount to constructive fraud, by which another has been misled to his or her injury." OCGA § 24-14-29. Estoppel is usually a question for the jury. *Vines v. Citizens Trust Bank*, 146 Ga. App. 845, 848 (1) (247 SE2d 528) (1978).

We note that the Georgia Legislature encourages private insurers to negotiate with hospitals to charge lower rates for medical care provided to covered patients, thus implicitly approving of a payment scheme like the one here.[12] See OCGA § 33-30-21; see also *Morrell*, supra, 280 Ga. App. at 1 n. 3. The lien statute at issue, however, expressly provides that the lien amounts must be "reasonable." See OCGA § 44-14-470. We are not inclined to say that summary judgment is warranted on these issues where, as here, discovery has not been completed.

As to the fraud claims, Bowden alleged that TMC filed false liens in that the liens were excessive and unreasonable, and that she justifiably relied on those liens. "[F]raud requires five essential elements: a false representation, scienter, inducement, reliance, and injury resulting from reliance on the false representation." (Citation and punctuation omitted.) *Cox v. Bank of America, N. A.*, 321 Ga. App. 806, 807 (2) (742 SE2d 147) (2013). "The essential elements of a claim of negligent misrepresentation are (1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false

---

[12] TMC points to *Kight v. MCG Health*, 296 Ga. 687 (769 SE2d 923) (2015), to support its argument that it was permitted to place on lien on the entire amount. That case, however, did not address the reasonableness of the charges and the lien amount. 296 Ga. at 689 (1).

information; and (3) economic injury proximately resulting from such reliance." (Citation and punctuation omitted.) *Home Depot U.S.A. v. Wabash Nat. Corp.*, 314 Ga. App. 360, 367 (3) (724 SE2d 53) (2012). Again, without the benefit of discovery, we find summary judgment to be inappropriate.

For the foregoing reasons, we affirm the trial court's orders admitting the expert's testimony and granting class certification, and we affirm the trial court's denial of TMC's motion for summary judgment on the claims of unjust enrichment, unconscionability, breach of contract, fraud, negligent misrepresentation, attorney fees, and punitive damages. We reverse the trial court's order denying summary judgment with respect to Bowden's claims arising under the UDTPA and the RICO Act.

*Judgment affirmed in part and reversed in part. Brown, J. concurs in judgment only. Goss, J. concurs in Division 1 and 3, and dissents as to Division 2.*

**\* THIS OPINION IS PHYSICAL PRECEDENT ONLY. COURT OF APPEALS RULE 33.2 (a).**

A18A1249.  THE MEDICAL CENTER, INC., v. BOWDEN et al.

GOSS, Judge, dissenting in part.

Although I agree with the majority that the trial court did not err when it admitted the testimony of plaintiffs' expert and did err when it denied TMC's motion for summary judgment as to plaintiffs' claims under the UDTPA and Georgia RICO, I believe that the trial court erred when it certified this class. I come to this conclusion on the basis of the Supreme Court of Georgia's decision in *Georgia-Pacific Consumer Products, LP v. Ratner*, 295 Ga. 524 (762 SE2d 419) (2014), which established that "certification of a class is appropriate only to the extent that the trial court is satisfied, after a rigorous analysis," that the requirements of Georgia's class

action statute "have been satisfied." (Citations and punctuation omitted.) Id. at 526; see also *Rite Aid of Ga. v. Peacock*, 315 Ga. App. 573, 574-575 (1) (726 SE2d 577) (2012). Because the record here does not support the trial court's determination that plaintiffs have met the commonality requirement set out in OCGA § 9-11-23 (a), I respectfully dissent to Division 2 of the majority opinion.

In order to establish commonality under OCGA § 9-11-23 (a), plaintiffs "were required to show 'that the class members have suffered the same injury.'" *Ratner*, 295 Ga. at 528 (1), quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U. S. 338, 350 (II) (A) (131 SCt 2541, 180 LE2d 374) (2011).

> To do so, the plaintiffs had to point to a "common contention" that each member of the class had suffered the same instance or course of wrongful conduct, and the plaintiffs also had to show that this "common contention" is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

(Citations, footnotes and punctuation omitted.) 295 Ga. at 528 (1). "What matters to class certification is not the raising of common questions – even in droves – but rather the *capacity of a classwide proceeding to generate common answers* apt to drive the resolution of the litigation." (Citation and punctuation omitted; emphasis supplied.)

Id.; see also *Carnett's, Inc. v. Hammond*, 279 Ga. 125, 129 (4) (610 SE2d 529) (2005) ("A common question is not enough when the answer may vary with each class member and is determinative of whether the member is properly part of the class.").

The trial court certified the class before us as including "[a]ll persons who have had a hospital lien filed pursuant to OCGA § 44-14-470 et seq. by TMC for the years 2007 to present against a cause of action they possessed and which lien was filed in an amount *in excess of what is a reasonable charge* for the care and treatment rendered." (Emphasis supplied.) As the Fifth Circuit has concluded, however, "[t]he amount patients were charged and the amount that is 'reasonable' for the services they received is necessarily an individual inquiry that will depend on the specific circumstances of each class member, the time frame in which care was provided, and [the] hospitals' costs at that time." (Citation omitted.) *Maldonado v. Ochsner Clinic Fund*, 493 F.3d 521, 524 (5th Cir. 2007). State courts considering the same issue have likewise concluded that the use of chargemaster rates "as a benchmark for the reasonableness of a hospital's charges is not persuasive" in favor of certification because such rates may "stem from legal and contractual requirements that applied solely to those classes of patients and [are] not necessarily based on market factors or on the actual costs of the services provided." *Eufaula Hosp. Corp. v. Lawrence*, 32

3

So.3d 30, 46 (Ala. 2009); see also *Howard v. Willis-Knighton Medical Ctr.*, 924 So.2d 1245, 1263 (La. App. 2006).

Our Supreme Court has also noted that the patient against whom a lien is filed need not be responsible for a hospital lien in order for the lienholder hospital to foreclose on that lien as against "some other person or entity[,]" such as the third-party insurers involved here. *MCG Health, Inc. v. Owners Ins. Co.*, 288 Ga. 782, 785 (1) (707 SE2d 349) (2011). In other words, a patient against whom a lien is filed may never have to pay a penny of that lien.[1] As these plaintiffs admit, this class "properly includes [only] those with outstanding, unresolved liens." The class certification quoted above does not include this essential qualification, however, and is therefore overbroad as a matter of law.

---

[1] After Bowden was billed for treatment in the amount of $21,409.59, she presented a claim to the tortfeasor's insurer, which offered to settle for its policy limit of $25,000, but Bowden rejected the offer because she and TMC could not agree on how much of the settlement should go to TMC. At some unspecified point after our Supreme Court's decision in *Bowden II*, moreover, TMC voluntarily dismissed its lien against Bowden. Plaintiff Pearce was billed for treatment in the amount of $3,317.60, which the third-party liability insurer disputes. Plaintiff Jasper was billed for $1,458.54, with her attorney paying that bill with the proceeds of the settlement paid by the tortfeasor's insurer. Plaintiff Sprouse was billed for $6,165.12, which amount was also paid by his attorney from the proceeds of the settlement paid by the tortfeasor's insurer.

4

In *MCG Health, Inc. v. Perry*, 326 Ga. App. 833, 838-839 (1) (755 SE2d 341) (2014), for example, we reversed the certification of a class composed of plaintiffs against whom hospital liens had been filed because our "examination of the plaintiffs' claims reveal[ed] a variety of factual and legal issues resulting in numerous individualized inquiries and answers." Id. at 836 (1). Although this trial court concluded that the single "common issue" is whether TMC's filing of liens at the chargemaster rate was "fraudulent," the court did not explain how such filings, which conform to what plaintiff's own expert describes as "a standardized file that establishes the price at which a hospital would bill for essentially everything they do," could amount to acts of fraud. We held in *Perry* that the certification of a class on such an undeveloped basis was error. 326 Ga. App. at 838-839 (1) (a trial court's one-sentence order certifying class on the basis of common questions including deceptive acts and practices in the filing of hospital liens "ignores the fact that these questions encompass factual and contractual contexts that necessarily vary across the class" and was thus an abuse of discretion).

This trial court also held that rates paid by commercial insurers and government payors could be used in calculating whether a particular lien was for a reasonable amount. But *Perry* also rejected a claim of commonality because any

determination of the reasonableness of the lien amounts would depend on individualized factors arising from the "relationship between [the hospital] and the insurance providers it contracts with and the relationship between the patients and their insurance providers." *Perry*, 326 Ga. App. at 836 (1). An additional factor is each individual patient's status as a third-party beneficiary of the hospital's contract with its insurer. Id. Further, the applicability of the voluntary payment doctrine would, as in *Perry*, "require individualized analysis under the facts of each lien resolution" such that the certification of this class was error. Id. at 837 (1).

For these reasons, the trial court erred when it certified this class. I therefore dissent.